IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| 25400 EUCLID AVENUE, LLC, | ) CASE NO. 1:08 CV 1865 |
| | ) |
| Plaintiff, | ) JUDGE BENITA Y. PEARSON |
| | ) |
| v. | ) MAGISTRATE JUDGE |
| | ) WILLIAM H. BAUGHMAN, JR. |
| FEDERAL DEPOSIT INSURANCE | ) |
| CORPORATION, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) **REPORT & RECOMMENDATION** |
| v. | ) |
| | ) |
| EMERALD GLEN TITLE AGENCY, LTD., | ) |
| | ) |
| Third-Party Defendant. | ) |

## Introduction

Before me by referral[1] are cross-motions for summary judgment or partial summary

judgment filed by plaintiff 25400 Euclid Avenue, LLC (25400 Euclid);[2] defendants Pappas

Family, LLC (Pappas Family);[3] defendant/third-party plaintiff Nevada LNV Corporation

(Nevada LNV);[4] and third-party defendant Emerald Glen Title Agency, Ltd. (Emerald

---

[1] ECF # 87.  The matter was referred to me for full pretrial supervision.  That referral
was not altered when the case was reassigned to United States District Judge Benita Y.
Pearson by non-document order dated January 1, 2011.

[2] ECF # 145.

[3] ECF # 146.

[4] ECF # 147.

Glen).[5] These motions have elicited numerous oppositions,[6] to which equally numerous replies have been filed.[7]  Despite an order expressly directing all parties to jointly submit a stipulation as to facts not in dispute,[8] and despite such order being amended to afford more time for specific parties to agree to a stipulation,[9] no stipulated facts of any kind have been filed by any party in response to that order.  Likewise, an attempt to schedule an oral argument on these various motions with a view toward narrowing the issues for decision[10] was unsuccessful.[11]

---

[5] ECF # 148.

[6] ECF # 157 (25400 Euclid's opposition to Nevada LNV's motion); ECF # 158 (25400 Euclid's "response" to Emerald Glen's motion); ECF # 159 (Pappas Family opposition to Emerald Glen's motion); ECF # 160 (Pappas Family's opposition to Nevada LNV's motion); ECF # 161 (Nevada LNV's opposition to Emerald Glen's motion); ECF # 162 (Nevada LNV's opposition to 25400 Euclid's motion); ECF # 163 (Nevada LNV's opposition to Pappas Family's motion); ECF # 164 (Emerald Glen's opposition to motions of 25400 Euclid and Pappas Family).

[7] ECF # 165 (Pappas Family reply is support of its motion); ECF # 166 (25400 Euclid's combined reply to opposition of LNV and Emerald Glen); ECF # 167 (Nevada LNV's reply to opposition of 25400 Euclid); ECF # 168 (Nevada LNV's reply to opposition of 25400's opposition to Emerald Glen's motion); ECF # 169 (Nevada LNV's reply to Pappas Family's opposition to Emerald Glen's motion); ECF # 170 (Nevada LNV's reply to Pappas Family's opposition to Nevada LNV's motion); ECF # 171 (Nevada LNV's reply to Emerald Glen's combined opposition to all summary judgment motions); ECF # 172 (Emerald Glen's reply to Nevada LNV's opposition); ECF # 173 (Emerald Glen's reply to opposition of 25400 Euclid and the Pappas Family).

[8] ECF # 102.

[9] ECF # 141.

[10] ECF # 188.

[11] ECF ## 189, 191, and 192.  The scheduled oral argument was cancelled by non-document order of July 1, 2011.

Accordingly, after distilling the operative facts and relevant arguments from a voluminous record, I will recommend, for the reasons set forth below, (1) granting defendant/third party plaintiff Nevada LNV's motion for summary judgment in part as it pertains to the claims against 25400 and the Pappas Family, (2) that Nevada LNV's claims against Emerald Glen be dismissed as moot, and (3) that all other claims for summary judgment by all other parties be denied or dismissed as moot.

## Facts

**A.    Background**

This controversy centers on the ownership of Richmond Towers, an apartment complex located at 25400 Euclid Avenue in Euclid, Ohio.  Depending on the answer to that question, the present matter may also involve claims against participants in various transactions involving this property that have occurred – or are purported to have occurred – since 2007.

Initially, I note there is no dispute that prior to July, 2007, Richmond Towers was owned by 24500 Euclid.[12]  24500 Euclid, in turn, was comprised of several individuals and entities, including the Pappas Family.[13]  However, after that date, ownership of Richmond Towers was transferred, encumbered, and contested in a complex series of events that give

---

[12] ECF # 146 at 7; ECF # 147 at 1.  For ease of reference, citations will be made to the relevant brief which, in turn, cites to the applicable part of the record.

[13] ECF # 147 at 1.

rise to this action.  The relevant facts of those events will be set forth in the chronology given below.

### 1.    *2007 contemplated sale from 25400 to Harris-created LLC*

In 2007, 25400 Euclid arranged to sell Richmond Towers to Claude Harris, who would operate through a newly-formed entity, C&G, LLC.[14]  The essential terms of this $4.5 million purchase were:  (1) Harris would assume $2.7 million of existing mortgage debt in the name of the new LLC; (2) Harris would sign a cognovit note requiring quarterly payments to 25400 Euclid for a period of years;[15] (3) Harris would pay cash at closing under a formula involving various credits, offsets, and escrowed items;[16] and (4) the Pappas Family would acquire an 8% interest in the newly-formed Harris entity that would be the owner of Richmond Towers, such Pappas ownership to be accomplished upon the earliest occurrence of one of several specified events.[17]

### 2.    *Closing of July, 2007*

As the time specified for the closing on this deal grew nearer, Harris found himself unable to secure the cash he needed to close.[18]  Accordingly, rather than assuming 25400's existing mortgage, he determined that he would obtain a new mortgage on Richmond Towers

---

[14] ECF # 146 at 7-8.

[15] *Id*. at 8.

[16] *Id*.

[17] *Id*.

[18] *Id*.

from Madison Realty Capital ("Madison") in an amount sufficient to both cover the $2.7 million of the existing mortgage he would otherwise be required to assume and also provide the cash Harris needed for closing.[19]  In addition, as part of the deal as newly structured by Harris, Harris would not to take title to Richmond Towers in the newly formed LLC, but would instead hold title in the name of an existing Harris entity – Universal Restaurants, LLC ("Universal").[20]

Harris engaged Emerald Glen to facilitate closing under these new arrangements.[21] The present action springs, in part, from what happened next.

First, on July 6, 2007, a quitclaim deed purporting to transfer title in Richmond Towers from 25400 to Universal was filed by Emerald Glen.[22]  That deed was signed on behalf of the grantor, 25400, by Harris acting as "managing member;" this despite the fact that Harris was never a member of 25400, had no existing ownership interest in 25400 and had no authority from the owners of 25400 to transfer Richmond Towers on their behalf.[23] That said, the quitclaim deed was nonetheless properly recorded.[24]

---

[19] *Id*.

[20] *Id*.

[21] *Id*. at 9.

[22] *Id*.

[23] *Id*.

[24] ECF # 147 at 1.

Next, on the same date, the new mortgage on Richmond Towers between Universal and Madison was also filed.[25]  That mortgage ("Madison I") conveyed Universal's title to Richmond Towers to Madison as security for the loan.[26]  The proceeds from this loan, as noted, were used to satisfy a prior existing mortgage on Richmond Towers.[27]

### 3.    Compromise and settlement agreement of late 2007

In late 2007, Harris and the Pappas Family agreed to modifications of their deal concerning Richmond Towers.[28] Among other features, the modifications adjusted amounts owed from one party to the other, released claims the parties had against each other arising from the July closing, and delayed the initial payment due from Harris on the cognovit note until January, 2008.[29]

### 4.    Actions of April and May, 2008

As of April, 2008, however, no payment had yet been made on the cognovit note.[30] This set in motion another train of events in April and May concerning Richmond Towers.

---

[25] ECF # 146 at 9.

[26] Id.

[27] ECF # 147 at 2.

[28] ECF # 146 at 10-11.

[29] Id.

[30] Id.

*a.* *April*

First, on April 1, 2008, Harris informed 25400 and the Pappas Family of his plans to refinance the Madison mortgage by obtaining substitute financing with IndyMac Commercial Lending ("IndyMac").[31]  That refinancing was to be based, in part, on IndyMac having a first lien position with respect to Richmond Towers.[32]

Next, on April 16, 25400 sued Harris and Universal for judgment on the unpaid cognovit note.[33]  As a result of this action, 25400 obtained a money judgment against Harris and Universal but did not then file a certificate of judgment.[34]

Then, on April 28, multiple events occurred pertaining to Richmond Towers.  For its part, 25400 filed another action against Harris and Universal, alleging breach of the purchase agreement.[35]  On the same day, Harris and Universal, in turn:  (1) caused a quit claim deed to be filed by Emerald Glen purporting to transfer Richmond Towers from Universal to CT Harris Enterprises, LLC – a limited liability company with Harris as its sole member;[36] and (2) entered into a separate mortgage with Madison ("Madison II") ostensibly for the benefit of Sedgwick Equities – another Harris-controlled real estate holding – that also

---

[31] ECF # 147 at 2.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 3.

[36] ECF # 146 at 11.

permitted Sedgwick, under a cross default provision, to foreclose on Richmond Towers in the event of a default on Madison II.[37]  There appears to be no dispute that Harris never informed the Pappas Family of his intent to transfer Richmond Towers from Universal to CT Harris Enterprises.[38]

*b.*    *May*

May, 2008 also contained numerous events relevant to ownership of Richmond Towers.  Because so many consequential occurrences happened that month, they will be set forth below as chronological bullet points:

- May 8 – The court in the breach of contract action filed by 25400 against Harris and Universal ruled that Harris could remain in possession of Richmond Towers after May 12 only upon his procuring refinancing.[39]

- May 12 – Harris, through counsel, filed with the court a notice of loan commitment describing a forthcoming refinancing from IndyMac.[40] That commitment notice detailed the terms of the loan, including that IndyMac take a first lien position in Richmond Towers, and further stated that as a condition of the loan Harris hold title to Richmond Towers in his individual capacity.[41]

---

[37] *Id*. at 9-11.

[38] *Id*. at 12.

[39] ECF # 148 at 5.

[40] *Id*.

[41] *Id*.

- May 20 – The refinancing deal between IndyMac and Harris closed.[42] As to ownership, the deal involved two immediate, sequential quitclaim transfers concerning Richmond.  Specifically, Richmond Towers was first conveyed by quitclaim deed from CT Harris Enterprises to Universal, which transaction was directly followed by a quitclaim deed from Universal to Harris.[43]  In the last transfer to Harris, it is not disputed that Emerald Glen, who prepared the deed, made an error by stating in the granting clause that title was being conveyed to Claude Harris, an Ohio limited liability company.[44]  In fact, there was no such LLC, and the grant should have been to Claude Harris, a married man.[45] Nonetheless, the deed containing the error was recorded, and the IndyMac mortgage between that institution and Claude Harris, a married man, was then also recorded the same day.[46]  In addition, that mortgage conveyed title in Richmond Towers to IndyMac as security for the mortgage loan.[47]

- May 22-27[48] – Having closed on the refinancing, Harris paid 24500 $244,000 from the proceeds of the IndyMac loan.[49]  Moreover, the Ohio court in the breach of contract action filed by 25400 issued an order dismissing all claims against Harris and Universal and further decreeing that Harris and Universal have possession of Richmond Towers.[50]

---

[42] *Id.* at 6.

[43] ECF # 146 at 12-13.

[44] ECF # 148 at 7.

[45] *Id.*

[46] *Id.*

[47] ECF # 146 at 13.

[48] The exact dates here are not clear from the briefing.  What can be determined is that the events related occurred between the dates specified.

[49] ECF # 147 at 5; ECF # 148 at 7.

[50] ECF # 147 at 5.

- May 30 – After being informed of the error in the deed of May 20, a corrected deed was re-recorded with the notation "Document being Refiled to correct Grantee Clause."[51]

**5.     Subsequent actions**

On June 18, 2008, 25400 filed the certificate of judgment lien reflecting the judgment it had obtained against Harris and Universal in April, 2008.[52]  The next day, June 19, 25400 filed a foreclosure action against Harris, Universal, and IndyMac seeking to foreclose the judgment lien filed the day before, and to obtain a money judgment.[53]  (This is the action that was later removed here, and is now the action before the Court.)[54]

In a series of steps beginning in July, 2008, IndyMac was put into federal receivership and its assets, including the mortgage loan in this case, placed under the control of a conservator.[55]  Ultimately, LNV was substituted for the conservator in this matter because it had received an assignment of the note and mortgage from IndyMac.[56]

---

[51] *Id.*

[52] *Id.* at 6.

[53] *Id.*

[54] *See*, *id.* at 7.

[55] *Id.* at 6-7.

[56] *Id.* at 7.

**6.     *Issue summary***

While the filings relevant to these motions have been previously delineated,[57] it remains useful to summarize the major issues confronting the Court in adjudicating the outstanding motions for summary judgment.

Essentially, as noted above, the core dispute centers on establishing ownership of Richmond Towers.  Nevada LNV, for its part, claims ownership by virtue of an allegedly first priority lien on Richmond Towers created in favor of IndyMac by the filing of the mortgage from Harris filed in May, 2008 – a date prior to 25400's recording of its judgment lien against Harris which was filed on June 22.[58] 25400 and the Pappas Family, for their part, argue, for different reasons, that because Harris transferred title to Richmond Towers and/or encumbered it many times, all purportedly without authority and with intent to defraud, those transfers – including the one at the root of the IndyMac mortgage – should be declared void.[59] Emerald Glen has a unity of interest with Nevada LNV insofar as both assert that the IndyMac mortgage should be recognized as having priority over claims by 25400 and the Pappas Family.[60]  However, in the event that 25400 and the Pappas Family should prevail,

---

[57] It should be noted that the entire docket presently contains 195 entries.

[58] *See*, ECF # 173 at 14; ECF # 171 at 1.

[59] *See*, ECF # 145 at 5; ECF # 146 at 6.

[60] *See*, ECF # 173 at 1; ECF # 171 at 1.

issues between Nevada LNV and Emerald Glen would exist as to claims of liability for negligence.[61]

For the reasons set forth below, I will recommend that Nevada LNV's motion for partial summary judgment be granted.

## Analysis

**A.     Standards of review**

*1.     Diversity jurisdiction*

The Sixth Circuit has stated the well-known rubric for adjudicating diversity cases as follows:

> The task of this court, sitting in diversity, is to apply the same law as would be applied by the [Ohio] state courts.  Where a state's highest court has spoken to an issue, we are bound by that decision unless we are convinced that the high court would overrule it if confronted with facts similar to those before us.  Moreover, where a state appellate court has resolved an issue to which the high court has not spoken, "we will normally treat [those] decisions ... as authoritative absent a strong showing that the state's highest court would decide the issue differently."  More recently we explained that an intermediate appellate decision, while lacking the controlling force of a decision of a state court of last resort, does serve as "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  We may refuse to follow intermediate appellate court decisions where we are persuaded that they fail to reflect state law correctly, but "we should not reject a state rule just because it was not announced by the highest court of the state," even if we believe that the rule is "unsound."[62]

_____

[61] ECF # 147 at 18-21; ECF # 173 at 29.

[62] *Ziebart Int'l Corp. v. CNA Ins. Cos.*, 78 F.3d 245, 250 (6th Cir.1996) (internal citations omitted).

"Other persuasive data" that could persuade a federal diversity court include the state's supreme court dicta, restatements of law, law review commentaries, and the majority rule among other states.[63]  Moreover, in considering how a state supreme court would decide an issue, "[a] federal court in a diversity case is not free to engraft onto ... state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits."[64]

## 2.    *Summary judgment*

Summary judgment is appropriate where the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[65]  The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.[66]

A fact is "material" only if its resolution will affect the outcome of the lawsuit.[67] Determination of whether a factual issue is "genuine" requires consideration of the applicable

---

[63] *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995).

[64] *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997) (internal citations omitted).

[65] Fed. R. Civ. P. 56(c).

[66] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)).

[67] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

-13-

evidentiary standards.[68] The court will view the summary judgment motion "in the light most favorable to the party opposing the motion."[69]

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.[70] Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[71] Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.[72]

In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."[73] However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard.[74]

---

[68] *Id.* at 252.

[69] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[70] *McDonald v. Petree*, 409 F.3d 724, 727 (6th Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 322).

[71] *Leadbetter v. Gilley*, 385 F.3d 683, 689 (6th Cir. 2004) (quoting *Anderson*, 477 U.S. at 248-49).

[72] *Anderson*, 477 U.S. at 249-50 (citation omitted).

[73] *Id.* at 252.

[74] *March v. Levine*, 249 F.3d 462, 471 (6th Cir. 2001).

-14-

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover.[75]  The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury."[76]  The text of Fed. R. Civ. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

"In other words, the movant can challenge the opposing party to 'put up or shut up' on a critical issue."[77]

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible.  The Sixth Circuit has concurred that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'"[78]  Rule 56(e) also has certain, more specific requirements:

> [it] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit.

---

[75] *Anderson*, 477 U.S. at 256.

[76] *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

[77] *BDT Prods. v. Lexmark Int'l*, 124 F. App'x 329, 331 (6th Cir. 2005).

[78] *Wiley v. United States*, 20 F.3d 222 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).

Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.[79]

However, the district court may consider evidence not meeting this standard unless the opposing party affirmatively raises the issue of the defect.  The burden is on the opposing party to object to the improper evidence; failure to object constitutes a waiver.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.[80]

As a general matter, the judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law."[81]  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter.[82]  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[83]

In sum, proper summary judgment analysis entails:

> the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can

---

[79] *Id.* at 225-26 (citations omitted).

[80] *Id.* at 226 (citations omitted).

[81] *Anderson*, 477 U.S. at 248.

[82] *Id.* at 249.

[83] *Id.*

be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[84]

**B.      Application of standards – Nevada LNV has an enforceable first lien on Richmond Towers**

*1.      Framing the issues*

The parties here have raised numerous issues, with many issues argued in the alternative, such that resolution would be required only upon meeting predicate conditions. As such, it is initially difficult to succinctly articulate the dispositive questions and to formulate a clear analytical framework for their resolution.  25400 and the Pappas Family, in particular, have sought to frame this case as a complex jigsaw puzzle of frauds and conspiracy.  The logical pathway outlined by this approach would require the Court to unravel, examine, and adjudicate multiple individual transactions over a period of years ostensibly to determine if each transaction may then lawfully serve as a basis for the transaction that follows.

While opposing parties have endeavored to respond to each of these claims in every transaction, a better course has been proposed by Nevada LNV and Emerald Glen. Specifically, if Nevada LNV, as a successor to IndyMac, is a bona fide purchaser for value of Richmond Towers, and acquired title without knowledge of any prior defects in or claims on that title, it would not be necessary to examine the prior transactions in the manner claimed by 25400 and the Pappas Family.  For the reasons that follow, I will recommend that

---

[84] *Id.* at 250.

the Court analyze this matter under the rules pertaining to a bona fide purchaser ("BFP") and further recommend that Nevada LNV be awarded partial summary judgment on that basis.

Thus, proceeding on that basis, there are three issues to be addressed: (a) whether the Nevada LNV mortgage has priority over 25400's judgment lien; (b) whether Nevada LNV's title is defective; and (c) whether Nevada LNV was a BFP. Those issues are considered below in sequence.

*a.* *As reformed, the Nevada LNV mortgage has priority over 25400's judgment lien.*

As to the initial question of what priority the Nevada LNV mortgage should have as compared to the 25400 judgment lien, under Ohio law a facially valid mortgage is presumed valid[85] and that the priority of liens against real property is determined by the dates such liens were recorded.[86] Here, there is no dispute that the Nevada LNV mortgage was recorded on May 20, 2008, while the 25400 judgment lien was not recorded until June 18, 2008.[87] Moreover, there is no dispute that, as a matter of Ohio law, obtaining a monetary judgment alone is not sufficient to create a lien on real property but, rather, a certificate of judgment must be filed.[88]

Thus, unless other factors exist, based upon Ohio's general rule as to chronological priority, the Nevada LNV mortgage would have priority over the 25400 judgment lien.

---

[85] *In re Zaptocky*, 250 F.3d 1020, 1024-25 (6th Cir. 2001).

[86] *Washington Mut. Bank v. Chiappetta*, 584 F. Supp. 2d 961, 964-65 (N.D. Ohio 2008) (citations omitted).

[87] *See*, ECF # 167 at 2 (citing record).

[88] *In re LaRotonda*, 436 B.R. 491, 495 (Bkrptcy. N.D. Ohio 2010) (citation omitted).

This, then, is the essential starting point for the present dispute. As stated, the arguments raised by 25400 and the Pappas Family are fundamentally about alleging circumstances that would preclude the operation of Ohio's general rule in this case. Primarily, those allegations center on the contention that "when Claude Harris gave a mortgage to IndyMac on May 20, he did not own the property.... [Thus,] [a]t the time IndyMac recorded its mortgage, someone other than the mortgagor owned the property."[89]

In such circumstances, the Pappas Family argues that: (1) Harris's title was acquired on May 30, subsequent to the filing of the mortgage on the 20th, and yet IndyMac never re-filed the mortgage after the 30th, which, the Pappas Family asserts, was necessary to "perfect[] its lien"; and (2) Nevada LNV was not a BFP with no knowledge of fraud because, unlike a true BFP, "IndyMac had actual knowledge of the pending litigation [between 25400 and Harris] directly affect[ing] ... the property it was taking as collateral for the loan it was planning to give Harris."[90]

*(b), (c)*  *The first-filed IndyMac mortgage loan was not defective; Nevada LNV is a BFP.*

As stated, the first argument against operation of the general Ohio priority rule is that the quitclaim deed recorded on May 20 conveying Richmond Towers from Universal Restaurant Holdings to "Claude Harris, an Ohio limited liability company," was defective and could not have transferred title to Claude Harris, a married man; and so, lacking good

---

[89] ECF # 145 at 22-23.

[90] *Id.* at 25.

title, Harris, individually, could not, in turn, have transferred title to IndyMac in the mortgage filed the same day.[91]  In that regard, it is not disputed, as discussed above, that the error in the granting clause was spotted, and a deed with a corrected granting clause was filed on May 30.

Therefore, the issue is what effect, if any, did the May 30 deed correction have on reforming any defect in the grant and on the mortgage which had been filed on May 20.

Nevada LNV and Emerald Glen assert first that any defect in the May 20 mortgage deed can be reformed here by this Court under Ohio law as a "scrivener's error," since the grant to "Claude Harris, an Ohio limited liability company" does not reflect the unambiguous intent of the parties that the grant be to Claude Harris, a married man.[92]  It further argues that, notwithstanding the ability to reform the deed, the re-recording of the deed on May 30 with a corrected granting clause is sufficient, since, for purposes of calculating the time of filing, a corrected deed is deemed filed on the date the original was filed.[93]

Several principles of Ohio law pertinent to further analysis must be set forth.

First, Ohio Revised Code § 2719.01 provides in relevant part that where there is "an omission, defect, or error" in a written instrument such that it is not "in strict conformity with the laws of this state," that instrument may be reformed by the court to "give full effect to such instrument" so as to reflect "the true, manifest intention of the parties thereto."  The

---

[91] ECF # 146 at 18-19.

[92] *See*, ECF # 167 at 3 (citing Ohio cases).

[93] *Id.* at 5.

Supreme Court of Ohio has construed this statutory reformation power as being limited to "technical defects of content" in written instruments and not to defects in the "mandatory form" of execution.[94]  In that regard, as this Court recently noted, under Ohio law "[a] court may reform an instrument where, due to mutual mistake, the instrument does not express the actual intent of the parties."[95]  To succeed on a reformation claim based on mutual mistake, the court "must find by clear and convincing evidence that the parties were mutually mistaken regarding the *contents*" of the instrument in question.[96]  Moreover, it is clear that under this reformation authority an Ohio court "'may reform the grantee provision of a deed'" if that provision is incorrect due to mutual mistake.[97]

Next, as to the issue of bona fide purchaser as applied to a mortgagee, the analytical foundation is the black letter law in Ohio that "[n]o one can convey a better title than he has, and that a transferee obtains no better title than his or her transferor had."[98]  This principle is operative in the first element of Ohio's rule that a mortgagee will be protected as a bona fide purchaser for value against claims by third parties as to the subject property if three

---

[94] *Delfino v. Paul Davies Chevrolet, Inc.*, 2 Ohio St. 2d 282, 285-86, 209 N.E.2d 194, 197 (1965).

[95] *ArcelorMittal Cleveland, Inc. v. Jewell Coke Co., L.P.*, 750 F. Supp. 2d 839, 847 (N.D. Ohio 2010) (citations omitted) (emphasis added).

[96] *Id.*

[97] *Snyder v. Monroe Township Trustees*, 110 Ohio App. 3d 443, 452, 674 N.E.2d 741, 747 (Ohio Ct. App. 1996) (quoting *Harvey v. Harvey*, 91 Ohio App. 3d 404, 411, 632 N.E.2d 956, 960 (Ohio Ct. App. 1993).

[98] 80 Ohio Jur.3d *Real Property Sales and Exchanges* § 63, 105 (2004).

conditions are met *at the time the mortgagee took the mortgage*:  (1) legal title was held by the mortgagor; (2) the mortgagee had no notice of any fraud or infirmity in the title; and (3) the mortgage was obtained for valuable consideration.[99]  In that respect, "a good faith mortgagor is charged with constructive notice only of the rights of persons in possession and the rights of persons claiming an interest under a duly recorded instrument."[100]

Applying the foregoing rubric in this case, I recommend following the guidance of the 2001 Ohio appellate decision in *Guarantee Title and Trust Co. v. American Mortgage Solutions, Inc*.[101]  *Guarantee Title*, as here, arose in the context of motions for summary judgment over the priority of claimed liens.  Essentially, the Kesteliks, a husband and wife, took title to real estate in 1992, and then in 1997, executed two mortgages to American Mortgage Solutions on the property in connection with refinancing.[102]  Neither mortgage was recorded at the time.[103]  Two years later, in 1999, the Kesteliks attempted to transfer title to the Colliers.[104]  However, in the deed to the Colliers, only John Kestelik was listed as the grantor, despite the facts that Theresa Kestelik's name appeared in the dower clause and she

---

[99] *FirstMerit Mortgage Co. v. Beers*, 2007 WL 2364625, at *6 (Ohio Ct. App. Aug. 13, 2007) (citations omitted).

[100] *Id*., quoting *Mellon Nat'l Mortgage Co. of Ohio v. Jones*, 54 Ohio App.2d 45, 48, 374 N.E.2d 666, 668 (Ohio Ct. App. 1977).

[101] *Guarantee Title & Trust Co. v. American Mortgage Solutions*, 2001 WL 958798 (Ohio Ct. App. Aug. 23, 2001).

[102] *Id*., at *1.

[103] *Id*.

[104] *Id*.

signed the deed.[105]  That deed was recorded in August, 1999, as was a mortgage from the Colliers to BNC Mortgage.[106]

As part of these filings, an affidavit was filed attaching copies of the first two then-unrecorded mortgages.[107]  Consequently, the holder of the first unrecorded mortgage filed a notice of *lis pendens* and began an action seeking a declaratory judgment that the first mortgage was superior to the Collier mortgage, asserting, among other arguments, that the first mortgage was valid at least as to Theresa Kestelik's one-half interest in the property which, it was claimed, did not transfer under the deed that did not include her as a grantor.[108] Seeking to remedy that defect, Theresa executed a corrected deed in September, which was immediately recorded.[109]

Thus, much like the present matter, the Ohio court needed to determine: (1) if Kestelik's deed to the Colliers (on which the BNC mortgage rested) could be reformed; (2) what effect Theresa Kestelik's corrected deed had, if any, on the various claims; and (3) whether the BNC mortgage was a valid first lien despite a purportedly intervening lien.[110] Based on the summary judgment record, the trial court held: (1) that the BNC mortgage with

---

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

the Colliers was the first lien because (2) the deed from the Kesteliks would be reformed to reflect the parties intent to have included Theresa's interest in the property, with (3) such reformed deed being effective as of the date the original deed was filed, thus precluding the priority of a subsequently filed lien.[111]

In affirming this decision, the appeals court noted that the Rule 56 evidence was clear that the parties to the Kestelik-Collier transfer intended to transfer Theresa's interest in the property as well as her husband's.[112]  In that regard, the Ohio appeals court emphasized that "there is no doubt that the [trial] court possesses the authority under Article 2, Section 28 of the Ohio Constitution, R.C. §§ 2719.01, 2719.05 and 2719.06 to reform the deed to the Colliers to express the intent of the parties."[113]  Most critical for the present case, the appellate court continued from that finding and further held that the original deed to the Colliers, as reformed to reflect the intent of the parties, "transferred the entire interest and the corrective deed transferred nothing."[114]

Accordingly, based on the decisional template of the Ohio appeals court in *Guarantee Title*, I recommend making the following findings of fact and conclusions of law in this matter on the Rule 56 record:

---

[111] *Id.*

[112] *Id.*, at *3.

[113] *Id.*

[114] *Id.*

-24-

- As a matter of law, this Court has the authority to reform the deed from Universal to Harris to reflect the unquestioned intent of the parties to that transaction that the deed be to Claude Harris, a married man, and not to Claude Harris, an Ohio limited liability company.

- As a matter of fact, the unrefuted Rule 56 evidence before the Court, noted above, establishes that the error was just that – "a simple, typographical mistake" by the title agency employee preparing the deed.[115]  Moreover, as is similar to *Guarantee Title*, the subsequent actions of the parties to the deed further reflect their original intent, including the almost immediate effort to file a correction and the unambiguous intent of the mortgagee to acquire a first lien as a condition of making the mortgage.

- Further, as a matter of Ohio law as articulated in *Guarantee Title*, the original deed from Universal to Harris, now reformed, transferred the entire interest in Richmond Towers at the time that first deed was filed, such that the purported correction filed 10 days later transferred nothing.

- Finally, because a valid transfer was fully effectuated by the original deed, now reformed, there is no issue as to whether the IndyMac mortgage is invalid purportedly because either no title transferred with the original filing or because the mortgage was not re-filed after the corrected deed was filed.  As the rule set down in *FirstMerit Mortgage* provides, IndyMac is entitled to protection as bona fide purchaser when, at the time it acquired the mortgage:  (1) Harris had title, (2) IndyMac had no notice of fraud or infirmity in the title as pertains to Harris or from any recorded instrument, and (3) the mortgage was for valuable consideration.

The last element of Ohio's rule by which a mortgagee acquires the status of a BFP is not in dispute.  IndyMac received the mortgage in exchange for its loan to Harris of $3,690,000.[116]  Further, as the prior analysis of Ohio law concerning reformed deeds makes

---

[115] ECF # 168 at 4 (citing evidence in the record).

[116] ECF # 147, Ex. B (Affidavit of Michael Cottrell) at ¶¶ 4, 5.

clear, IndyMac has satisfied the first element of being a BFP in this situation; specifically, that Harris had title to Richmond Towers at the time he mortgaged the property to IndyMac. Thus, the only remaining element to be determined is whether IndyMac acquired its interest with actual or constructive notice of fraud on the part of Harris or from any recorded instrument.

Again, the Rule 56 record contains unrebutted evidence that IndyMac at the time it made the mortgage had no knowledge from the property records of any lien against Richmond Towers except the Madison mortgage, which was to be satisfied out of the proceeds of IndyMac's refinancing.[117]  Moreover, although IndyMac was aware at the time it entered into the mortgage of the breach of contract action then pending between Harris and 25400, the prior judgment against Harris and various other issues concerning Harris and Universal,[118] IndyMac's "prudent man" inquiry also disclosed that Harris and 25400 were searching together for re-financing, such as from IndyMac, on Richmond Towers as a way to resolve their differences.  Indeed, as is clear and unambiguous from the record, IndyMac's mortgage was entered into with the actual knowledge of the relevant Ohio court and the parties to the breach of contract suit.[119]

Yet, despite being fully aware of IndyMac's intent to acquire a first lien on the property, neither 25400 nor the Pappas Family either sought to preemptively  perfect a

---

[117] *Id.* at ¶ 8, *see also*, ECF # 147, Ex. A (Affidavit of Robert D. Gutin) at ¶¶ 5, 12.

[118] *See*, ECF # 166 at 7-8 (citing issues and record).

[119] *See*, ECF # 167 at 20-22 (citing record).

claimed lien by filing such a claim for record before the IndyMac mortgage, nor did either entity – both of which were communicating through their counsel with IndyMac in advance of filing that mortgage[120] – attempt to raise with IndyMac issues of fraud concerning Harris or Universal.  In such circumstances, it is not possible to conclude as a matter of law that IndyMac had actual or constructive notice of some unfiled or unexpressed superior lien on Richmond Towers on the part of 25400 or the Pappas Family.

Thus, I recommend concluding as a matter of law that IndyMac (now Nevada LNV) is a bona fide purchaser for value, and acquired such rights prior to 25400 perfecting its judgment lien.

## Conclusion

Accordingly, for the foregoing reasons, I recommend granting defendant/third party plaintiff Nevada LNV's motion for summary judgment in part as it pertains to the claims against 25400 and the Pappas Family.  I further recommend that Nevada LNV's claims against Emerald Glen be dismissed as moot.  In turn, I finally recommend that all other claims for summary judgment by all other parties be denied or dismissed as moot for the reasons stated above.

Dated:   October 3, 2011                              s/ William H. Baughman, Jr.
                                                      United States Magistrate Judge

---

[120] *Id.*

## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.[121]

---

[121] *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also*, *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).